UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

FREDERICK BAKER,

       Plaintiff,

                                    Case No. 1:20-cv-201

v.

                                    Hon. Hala Y. Jarbou

FERRIS STATE UNIVERSITY,

       Defendant.

_____/

## **OPINION**

Plaintiff Frederick Baker brings a civil rights action against the Board of Control of Ferris State University. Baker was an adjunct instructor at Ferris State for twelve years, subject to periodic employment contracts. In 2019, his contract was not renewed. Baker, who is African American, asserts that the non-renewal was both the result of racial discrimination and retaliation for his complaints about that discrimination. Two claims, based on Title VII, remain: (1) race discrimination in violation of 42 U.S.C. § 2000e–5 (Count I); and (2) retaliation in violation of 42 U.S.C. § 2000e–3 (Count II).[1] Ferris State has moved for summary judgment on both Counts (ECF No. 109), while Baker seeks summary judgment on his retaliation claim (ECF No. 114). Ferris State's motion will be granted in part: Count I cannot proceed on a single-motive theory of liability but can go to trial on a mixed-motive theory of liability. Baker's motion for partial summary judgment will be denied.

---

[1] Baker also asserted two claims based on violations of Michigan's parallel civil rights law, the Elliott-Larsen Civil Rights Act. The Court dismissed those claims in a previous order because Ferris State is an arm of the state and thus immune to ELCRA actions brought against it in federal court. (1/28/2021 Order, ECF No. 80.)

# I. BACKGROUND

Baker began teaching at Ferris State around 2007.  An academic reorganization in 2014 placed Baker in the School of Digital Media (SDM), which itself sat beneath the College of Education and Human Services (COEHS) and the College of Extended and International Operations (EIO).  (Okonoski Dep. 25-26, 70-71, ECF No. 110-2.)  Glen Okonoski assumed the title of Coordinator of the SDM, which included supervisory authority over SDM adjunct instructors like Baker.  (*Id.* at 27-28.)  Okonoski worked out of the Big Rapids campus, while Baker taught out of the Grand Rapids campus.  (*Id.*)  Thus, Tracy Powers-Hilty, the Associate Dean in Grand Rapids and Baker's former direct supervisor, shared supervisory responsibility with Okonoski.  (*Id.* at 71.)

Everyone agrees that Baker was a great teacher.  But his supervisors were dissatisfied with Baker's performance of non-teaching duties.  (*See* Jackson Dep. 31-34, ECF No. 110-4.)  Okonoski felt Baker "had some problems with building trust, collaboration, communication, and working well" in the SDM.  (*Id.* at 34.)  When Baker's contract was up for renewal in 2017, Okonoski sought advice from Arrick Jackson, Dean of COEHS, on how to address these "challenges" with Baker.  (*Id.* at 33-34.)  Jackson suggested incorporating desired improvements in the job description of Baker's new employment contract (*id.* at 32), which Okonoski and Powers-Hilty did (Okonoski Dep. 77).  Among other things, Baker's 2017-2018 "Goals and Expectations" asked Baker to: (1) coordinate to "reduce the number of deviations" (i.e. offering the same course multiple times a year or permitting students to conduct independent studies to satisfy a degree requirement); (2) help with student recruitment and attend recruitment events; (3) "[n]otify the office of absences prior to . . . office hours"; and (4) "[r]espond to administration emails within two business days[.]"  (ECF No. 110-5.)

Several months later, in February 2018, Baker contacted Kylie Piette, Director of Ferris State's Equal Opportunity Office, and said he was experiencing racial discrimination.  (Piette Dep. 34, ECF No. 110-6.)  They met on March 14, where Baker stated that: (1) Okonoski encouraged non-Black employees to seek tenure, but not him; (2) Okonoski had written racially demeaning emails; (3) he was subjected to an unreasonable workload; and (4) that he had a recording of Okonoski making racially-based comments.[2] (3/21/2018 Piette Follow-up Email, ECF No. 110-8.)  Baker also believed that Nick Kuiper, who oversaw the process for developing online courses that could earn teachers extra money, and Jackson, who approved online courses, were holding up the approval process for his courses for discriminatory reasons.  (Piette Dep. 40, 50, 171.)

Over the next month or so, Baker and Piette exchanged emails discussing the potential discrimination.  Baker provided information requested by Piette, including emails from Okonoski and others that he believed demonstrated discriminatory animus.  (3/28/2018 Baker Email; Compiled Email Exchanges, ECF No. 110-10.)  On April 20, Piette emailed Baker to ask whether he still wanted to pursue "possible action(s) against Glen Okonoski and/or Nick Kuiper[.]" (4/20/2018 Piette Email, ECF No. 110-13, PageID.1000.)  Baker replied that he was "still deciding . . . the best time to bring this forward."  (4/24/2018 Baker Email, ECF No. 110-13, PageID.1001.)  Piette said she would "keep all notes of our meeting/conversations and the documentation on file" should Baker want to proceed in the future.  (5/8/2018 Piette Email, ECF No. 110-13, PageID.1001.)  Coincidentally or not, this was around the time that the courses Baker believed were being held up by Kuiper received final approval.  (4/19/2018 Email, ECF No. 110-16, PageID.1013.)

---

[2] Responding to Piette's email, Baker said he could not attach the recording because the file was too large and promised to share it later.  (3/28/2018 Baker Email, ECF No. 110-9.)  It does not appear that any such recording was ever provided to Piette, nor is there any such recording in the record before the Court.  At his deposition, Baker said that he never heard Okonoski "use racial slurs" in his presence.  (Baker Dep. 130, ECF No. 110-11.)

Okonoski and Dawn Schavey—who replaced Hilty-Powers as Baker's Grand Rapids-based supervisor—continued to be dissatisfied with Baker's performance of non-teaching duties. (*See* Okonoski Dep. 81; Schavey Dep. 46, ECF No. 110-22.)  On October 3, 2018, Okonoski emailed Jackson, Schavey, and Steve Reifert, Dean of the EIO, outlining his frustrations with Baker.  (10/3/2018 Okonoski Email, ECF No. 110-21.)  The catalyst was a complaint from a student's father about Baker's purported bad course advising and a purported attempt by Baker to circumvent normal processes to teach a class in the upcoming semester.  (*Id.*, PageID.1117.) Okonoski noted, however, that the issues he was raising were "not new concerns."  (*Id.*)

Under a heading labeled "Defensive," Okonoski noted that Baker consistently refused to accept any responsibility for errors or "acknowledge any shortcomings on his part," instead blaming mistakes on others.  (*Id.*)  He said that he had no problem with people making mistakes, but that addressing issues was "very difficult [given] the defensive posture that [Baker] takes." (*Id.*)  The "general impression" Okonoski had was that Baker felt Okonoski had "no right to question" Baker.  (*Id.*)

Under a heading labeled "Non-Responsive," Okonoski relayed several occasions on which Baker failed to promptly respond to emails, if at all, or would otherwise offer only partial and unhelpful answers to questions, or would not respond to all appropriate parties in an email thread. (*Id.*, PageID.1117-1118.)  "In general, [Baker] seems to pick and choose which emails he responds to.  When he responds, he often selectively picks who to respond to."  (*Id.*, PageID.1118.)

The next section forms a pillar of Baker's claims.  Under a heading labeled "Combative," Okonoski stated that Baker "has on several occasions suggested, subtly and not, that he is being discriminated against—be it by me, or others."  (*Id.*)  He wrote that his "motivation towards [Baker] has never been racially motivated," nor had he observed racial animus against Baker by

other Ferris State employees.  (*Id.*)  But Okonoski said that the "undertone . . . create[d] a difficult dynamic."  (*Id.*)  Specifically, Okonoski believed that Baker had "insinuated" racial discrimination was behind the denial of a travel grant and Baker's difficulties in getting online courses approved. (*Id.*)

In a final section labeled "College, School Organization," Okonoski complained that Baker frequently tried to circumvent school processes and his supervisors "in pursuit of what he thinks should happen."  (*Id.*)  "[W]hen confronted, he claims ignorance—ignorance that is caused because he wasn't informed by others as he should have been—again, no accountability."  (*Id.*) Okonoski said that he tries "to ignore the pretty plain fact that [Baker] doesn't respect [Okonoski's] position or role" at Ferris State.  (*Id.*)  He concluded by saying that he "can't count on [Baker] to respond or do what he is asked," that Baker "is an effective teacher" but an overall "average employee," and that "[t]he way he approaches things creates more work for those around him," particularly his supervisors.  (*Id.*)  Okonoski requested a meeting with Jackson, Schavey, and Reifert "to discuss strategies that can be employed to hold [Baker] more accountable."  (*Id.*)

Jackson recommended that Okonoski place Baker on a "Performance Improvement Plan" (PIP), which would outline areas of Baker's job that his supervisors felt needed improvement. (Jackson Dep. 39.)  Okonoski took the advice.  On October 25, 2018, Jackson and Okonoski met with Baker to present the PIP.  (Okonoski Dep. 93.)  Jackson attended the meeting to make clear that he and Okonoski were "on the same page" regarding the necessity of a PIP.  (Jackson Dep. 43.)  Baker asked Piette to join, but she said her role did not permit her "to be a representative for any particular person" and instead advised Baker to take "copious notes" and contact her to debrief. (Piette Dep. 67-68.)

The PIP detailed desired improvements with respect to responsiveness, following processes, respecting authority, taking accountability, building trust, collaboration, and communication.  (October 2018 PIP, ECF No. 110-23.)  It also provided for periodic progress evaluation meetings between Baker and his supervisors.  (*Id.*, PageID.1153.)  The PIP warned that failure to make the identified improvements could result in termination.  (*Id.*)

Baker met with Piette to discuss the PIP on November 15.  (Piette Dep. 68.)  Baker asked how to file a complaint with the Equal Employment Opportunity Commission (EEOC), and Piette explained.  (*Id.* at 71.)  Piette also told Baker that he could lodge a complaint with the Michigan Department of Civil Rights or Ferris State's EO office.  (*Id.* at 72.)  Baker said he wanted more time to deliberate on his preferred course of action.  (*Id.*)

On November 28, Baker had his first PIP progress evaluation meeting with Okonoski and Schavey.  (Okonoski Dep. 96.)  Okonoski noted improvement in Baker's email responsiveness and keeping his supervisors in the loop.  (11/29/2018 PIP Update Email from Okonoski to Jackson, ECF No. 110-24; *see also* 11/28/2018 Meeting Tr., ECF No. 110-49[3].)  But he also saw areas where Baker did not improve, including more tension with coworkers regarding the online course development process, which had recently changed.  (11/29/2018 PIP Update Email from Okonoski to Jackson.)  After the meeting, Okonoski emailed Baker requesting him to do various things. Okonoski sent an email containing additional requests on December 6.

Okonoski sent a third email on December 7 detailing various tasks from the previous two emails that Baker had failed to acknowledge or address.  (12/7/2018 Okonoski Email, ECF No.

---

[3] Baker recorded many school meetings on his phone.  Ferris State accuses him of doing this secretly, perhaps to the extent of violating Michigan law.  (*See* Def.'s Br. in Opp'n to Pl.'s Mot. for Summ. J 17, ECF No. 121.)  The record is a bit mixed on whether other meeting participants were aware that they were being recorded.  (*See* 11/29/2018 PIP Update Email from Okonoski to Jackson ("[Schavey] and I both had the impression that our meeting was being audio recorded.").)

110-25, PageID.1158-1159.)  So Okonoski requested Baker accomplish five things "by 5:00pm on December 10[.]"  (*Id.*, PageID.1159.)  Baker did not respond to that email, either.  Okonoski emailed Jackson, Schavey, and Reifert explaining the situation.  (12/10/2018 Okonoski Email, ECF No. 110-25, PageID.1157.)  He expressed frustration at Baker's failure to address matters that Okonoski viewed as time-sensitive, described the non-responsiveness as an issue highlighted by the PIP, and believed that Baker's behavior had "become plain insubordination."  (*Id.*, PageID.1558.)  Okonoski concluded by saying he had done what he could "to engage [Baker] and hold him accountable."  (*Id.*)  He requested advice on "any further steps to be taken[.]"  (*Id.*)

The next PIP progress evaluation meeting occurred on February 13, 2019.  (Okonoski Dep. 99-100.)  As with the November meeting, Okonoski noted some areas of improvement, but continued to see complaints about Baker from coworkers handling the development of online courses, particularly Tracy Russo. (2/13/2019 PIP Follow-up Document, ECF No. 110-26.)  When Okonoski reported these complaints, Baker insisted that he was doing everything asked of him and that his coworkers were randomly changing requirements on him.  (2/13/2019 Meeting Tr. 5-12, ECF No. 110-50.)  Okonoski reiterated that the coworkers' "role in the process needs to be respected and the feedback . . . [they] provide[d] need[ed] to be addressed as part of the online course development" process.  (2/13/2019 PIP Follow-up Document, PageID.1162.)

There continued to be issues surrounding online course development and approval, so Baker, Okonoski, and Russo, among others, met on March 22 to discuss.  (Okonoski Dep. 105-07.)  Russo explained what she felt was deficient about Baker's pending online courses. Disagreeing with her assessment, Baker "became angry" and "raised his voice[.]"  (*Id.* at 107.)  Jackson emailed Okonoski on March 25, asking how the meeting went.  Okonoski said it "did not go well" and that he had "concerns that the situation between [Russo] and [Baker] is not productive, due largely to

[Baker's] confrontational approach."  (3/25/2018 Jackson-Okonoski Emails, ECF No. 110-35, PageID.1198-1199.)  Two days later, Baker missed a recruiting event that he had promised to attend.  (3/27/2019 Email Exchange, ECF No. 110-36.)

During this time, Baker also exchanged emails with Piette about the possibility of lodging a complaint about discrimination.  (*See* Piette Dep. 78.)  They had a meeting in February 2019, and further emails in March.  Baker was apparently under the impression that Piette would initiate an investigation, whereas Piette believed she was to wait for more information from Baker before investigating.  (*See id.* at 74, 79-80.)  They spoke again on April 4, where Piette understood that Baker wanted her to commence an investigation.  (*Id.* at 78.)

The day before he met with Piette, April 3, Baker emailed a colleague in the SDM, Mohamed Abusharkh, requesting certain information to use "as evidence in the current ongoing investigation with" Ferris State's EO office.  (4/3/2019 Email from Baker to Abusharkh, ECF No. 110-37, PageID.1208.)  Abusharkh forwarded the email to Okonoski and Schavey asking them to "[p]lease advise" and stating that he had "not received anything from anyone from the EEO about any investigation as of today [April 3, 2019]."  (4/3/2019 Abusharkh Email, ECF No. 110-37, PageID.1208.)

Neither Okonoski nor Schavey knew of any investigation, so Schavey emailed Piette asking whether there was "an investigation [they] should be aware of[.]"  (4/3/2019 Emails, ECF No. 110-37, PageID.1207.)  Piette told them that Baker contacted her "with the intent to file a complaint," but that she was "still evaluating exactly what his complaint is and what any investigation, if applicable might entail."  (4/3/2019 Piette Email, ECF No. 110-37, PageID.1206.)  She concluded by saying that "the investigation is not 'ongoing' as much as 'potentially

beginning.'"  (*Id.*)  Okonoski forwarded Piette's email to Jackson and Reifert.  (4/3/2019 Emails, PageID.1206.)

These emails form another pillar of Baker's claims because they occurred right around the time that Okonoski and Schavey claim that they decided to recommend against renewing Baker's employment contract.  On April 9, six days after learning that Baker was pursuing some kind of EO investigation, Okonoski emailed Jackson and Reifert "to formally recommend that . . . Baker's contract . . . not be extended/renewed" because he and Schavey felt Baker had "not made enough progress in any of the three areas that he was given as opportunities for improvement: Building Trust, Collaboration, [and] Communication."  (4/9/2019 Okonoski Email, ECF No. 110-38.) Though the formal recommendation came on April 9, Schavey and Okonoski apparently discussed not renewing Baker's contract beginning in March.  (Schavey Dep. 68-69.)  Okonoski had also discussed recommending non-renewal with Jackson before the April 9 email.  (Jackson Dep. 63-64.)  At his deposition, Okonoski said he initially believed that Baker's EO complaint would be leveled against Russo and others involved in online course development rather than against Okonoski himself.  (Okonoski Dep. 108-09.)

Jackson felt that it would be best to let the EO investigation run its course before deciding whether to renew Baker's employment contract.  (Jackson Dep. 56-57, 64.)  At the same time, however, he told Okonoski to write a formal letter addressed to Jackson and Reifert asking that Baker's contract not be renewed and giving his reasons for the request.  (Okonoski Dep. 110-11.) Okonoski and Schavey submitted such a letter on April 26.  (4/26/2019 Letter, ECF No. 110-39.) The letter stated Okonoski's and Schavey's views that a final PIP meeting would likely be fruitless, that they did not believe Baker "made significant progress on the items outlined on the PIP," and recommended that "Baker's contract not be renewed."  (*Id.*)

9

Ultimately, Jackson left the decision to Okonoski, Schavey, and Reifert because he was leaving his position at the end of June.  (Jackson Dep. 65.)  On June 12, Reifert emailed Schavey and Okonoski supporting Baker's non-renewal and requesting "some bullet points" regarding Baker ahead of a meeting Reifert would have with Provost Paul Blake.  (6/12/2019 Reifert Email, ECF No. 110-44, PageID.1231.)   Okonoski reiterated the issues highlighted previously, concluding that Baker "is very difficult to manage, and doing so takes an inordinate amount of time."  (6/12/2019 Okonoski Email, ECF No. 110-44, PageID.1230.)

Two weeks later, on June 27, Reifert and Okonoski informed Piette of their desire to not renew Baker's contract.  (Piette Dep. 119-20.)  On a call, they asked Piette for advice given the ongoing EO investigation she was conducting.  (*Id.* at 121.)  By this time, Baker had told Piette that Okonoski was discriminating against him.  (*Id.* at 121-22.)  Piette did not tell Reifert and Okonoski about this on the call.  (*Id.* at 120-22.)  She asked them to provide reasons for the non-renewal.  (*Id.* at 122.)  After the call, Reifert forwarded the bullet points from Okonoski's June 12 email and said he would like to give Baker "30 days notice of non-renewal."  (6/27/2019 Reifert Emails, ECF No. 110-44, PageID.1229.)

Meanwhile, Baker continued to communicate with Piette after filing his EO complaint.  It appears that much of the investigation initially focused on the online course approval process. Piette hosted a mediation, which reached a tentative resolution on June 11, 2019: Russo would no longer be involved in reviewing Baker's proposed online courses—other colleagues would handle that—and Baker would reduce the number of courses he was trying to develop at any given time. Also at the June 11 mediation, Baker gave Piette a "hard copy . . . Excel spreadsheet" listing alleged acts of discrimination by Russo and Okonoski.  (Piette Dep. 122.)

About two weeks after the mediation with Russo, Baker emailed Piette a digital version of the spreadsheet.  (ECF No. 110-43.)  A few of the examples related to Russo, though the bulk involved purported discrimination by Okonoski.  (*See id.*)  Piette expressed confusion about the examples involving Russo because in the June 11 mediation, Baker had "acknowledged that [Russo] had not done or said anything that would indicate racial bias."  (6/28/2019 Piette-Baker Email, ECF No. 110-45, PageID.1233.)  Piette referred to the examples involving Okonoski as "a list of allegations . . . . None of the statements [] provided are 'evidence;' they are statements of your belief" that would require proof through "circumstantial or direct" evidence.  (*Id.*)  Piette attached "a list of specific questions" regarding Baker's allegations against Okonoski to be answered if Baker chose "to pursue the investigation . . . against [Okonoski]."  (*Id.*, PageID.1234.)

Piette saw the conundrum: Baker's supervisors sought to end his employment at Ferris State at the same time that he was pursuing complaints of racial discrimination by, among others, his supervisor.  (Piette Dep. 122.)  Concerned about a potential retaliation claim, she sought legal advice from Miles Postema, Ferris State's Vice President and General Counsel.  (*Id.*)  Piette, Postema, Okonoski, Schavey, and Reifert met in early August to discuss the issue.  (*Id.* at 133.)  It is not exactly clear when, but at some point it was decided that Baker's contract would not be renewed in August.

To that end, Reifert tried to meet with Baker by going to his office during posted office hours on August 13.  (*See* Reifert Dep. 27-28, ECF No. 110-46.)  Ferris State characterizes this as a "scheduled [] meeting" (Def.'s Br. in Supp. of Mot. for Summ. J. 24, ECF No. 110), though the record is unclear on whether there was any official plan to meet.  (*See* Reifert Dep. 28 ("I think [Schavey] had told [Baker] that I wanted to talk to him, so I don't know if you could consider that scheduled or not.").)  Either way, Baker did not show up to his office hours because he had called

11

in sick.  (*Id.*)  Instead, Reifert emailed Baker informing him that his employment contract, set to expire on August 24, would not be renewed.  (8/13/2019 Reifert Email, ECF No. 110-47, PageID.1248.)  Attached to the email was a letter explaining the reasons for non-renewal: "unsatisfactory work performance and the lack of significant progress [on the PIP] initiated in the Fall of 2018."  (8/13/2019 Reifert Email Attachment, ECF No. 110-47, PageID.1250.)

Piette continued the EO investigations into Russo and Okonoski.  On March 30, 2020, Piette produced one report for each investigation.[4]  (Russo EO Report, ECF No. 6-1; Okonoski EO Report, ECF No. 6-2.)  Both reports concluded that Baker "did not provide sufficient corroborative evidence to establish that he was subjected to race discrimination [from either Russo or Okonoski] or retaliation [by Okonoski] . . . . [T]here is no material evidence that [Russo or Okonoski] . . . engaged in conduct in violation of University policies or applicable law."  (Russo EO Report 18; Okonoski EO Report 38.)

## II. STANDARD

Summary judgment is appropriate when the moving party demonstrates that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  Courts must examine the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," to determine whether there is a genuine dispute of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (quoting Fed. R. Civ. P 56(c)) (internal quotations omitted).

A fact is material if it "might affect the outcome of the suit."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A material fact is genuinely disputed when there is "sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party."  *Id.* at 249

---

[4] Piette's report on Russo is incorrectly dated March 30, 2019.

12

(citing *First Nat'l Bank. of Ariz. v. City Serv. Co.*, 391 U.S. 253, 288-89 (1961)).  "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party [by a preponderance of the evidence], there is no 'genuine issue for trial.'"  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quoting *City Serv.*, 391 U.S. at 289).

In considering the facts, the Court must draw all inferences in the light most favorable to the nonmoving party.  *Id.*  Summary judgment is not an opportunity for the Court to resolve factual disputes.  *Anderson*, 477 U.S. at 249.

## III. ANALYSIS

### A. Count I

Baker asserts that his employment contract was not renewed for racially discriminatory reasons.  Ferris State seeks summary judgment on the ground that Baker's claim cannot survive the *McDonnell Douglas* framework, described below.  Baker counters that *McDonnell Douglas* works out in his favor and that he can also proceed on the theory that racism was merely a motivating factor behind his non-renewal.  *McDonnell Douglas* only applies where the plaintiff claims he would not have been fired but for his race, i.e. racial animus was *the* motivating factor behind the termination.  So-called mixed-motive claims, on the other hand, are not subject to *McDonnell Douglas* on summary judgment.  *White v. Baxter Healthcare Corp.*, 533 F.3d 381, 400 (6th Cir. 2008).

Ferris State does not address whether Baker could proceed to trial on a mixed-motive theory of his employment discrimination claim.  Consequently, the Court will not enter summary judgment on Count I.  However, the Court finds that Baker has not established a *prima facie* case under *McDonnel Douglas*.  So Baker cannot claim that his race was the only reason his contract was not renewed.  Therefore, the Court will enter summary judgment on Count I to the extent that Baker asserts a single-motive claim of discrimination.

13

### 1. Single-motive discrimination

Title VII prohibits an employer from taking adverse actions against an employee "because of [the employee's] race, color, religion, sex, or national origin[.]"  42 U.S.C. § 2000e-2(a)(1).  A plaintiff need not produce direct evidence of discrimination to show that he suffered an adverse action "because of" his race; circumstantial evidence will suffice.   *White*, 533 F.3d at 391.  However, claims premised on circumstantial evidence are subject to the burden-shifting framework announced by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).  *McDonnell Douglas* unfolds in three stages.  First, the plaintiff must "establish a *prima facie* case of discrimination by a preponderance of the evidence."  *White*, 533 F.3d at 391.  If he can do so, the defendant-employer must "articulate some legitimate, nondiscriminatory reason" for its action.  *McDonnell Douglas*, 411 U.S. at 802.  If the employer can do so, the burden shifts back to the plaintiff, who must produce evidence showing that the reason given by the employer was merely pretextual.  *Id.* at 804-05.

A *prima facie* case of employment discrimination has four elements.  "[A] plaintiff must demonstrate that: (1) he is a member of a protected class; (2) he was qualified for his job; (3) he suffered an adverse employment decision; and (4) he was replaced by a person outside the protected class or treated differently than similarly situated non-protected employees."  *White*, 533 F.3d at 391.  Because Ferris State successfully argues that Baker has failed to show that he was replaced by a non-African American person or that he was treated differently than non-protected employees, the Court will limit its analysis to the fourth element.  Nothing in the record indicates that Baker was replaced one way or the other, so the question is whether he was treated differently than similarly situated colleagues.

To show that he was treated differently, Baker must propose adequate "comparators"— non-African American coworkers who were "similar in all relevant respects" and who "engaged

in acts of comparable seriousness" but nevertheless had their employment contracts renewed. *Bobo v. United Parcel Serv., Inc.*, 665 F.3d 741, 751 (6th Cir. 2012). Baker argues that he has established this prong in two ways: (1) by pointing to non-African American professors or adjuncts who exhibited similar conduct—tardy email responses, missing recruiting events, etc.—but were not placed on PIPs or otherwise terminated; and (2) by showing that non-African American professors in the SDM were consistently recommended for and granted tenure. (Pl.'s Resp. in Opp'n to Def.'s Mot. for Summ. J. 18, ECF No. 122.) Each route is flawed.

First, Baker cites to various portions of Schavey's deposition, where she confirms that other professors or instructors under her supervision fell short in various ways similar to Baker but were not placed on PIPs or terminated. (*Id.* (citing Schavey Dep. 28-29, 53 (missed recruiting events), 77 (wrong paperwork), 87-88 (incorrect scheduling leading to missed meetings/events)).) The problem is that the questions and answers are overly broad such that it is impossible to know whether these proposed comparators were non-African American. Here is an exemplary passage: Q: "Have any other instructors or professors under your supervision RSVP'd and then canceled last minute for an event?" A: "I'm sure that there are examples of that." (Schavey Dep. 81-82.) The record cited by Baker do not point to any real comparators, and, more fatally, does not tell the Court whether any of the other "examples" involved non-African American professors or instructors.

With respect to the tenure track issue, Baker can point to specific comparators like Abusharkh. Abusharkh joined the SDM faculty after Baker had been there for almost a decade; yet Abusharkh made tenure after just a few years. However, Baker must point to similarly situated coworkers who "engaged in acts of comparable seriousness," *Bobo*, 665 F.3d at 751, but escaped the punishment levied against Baker. Pointing to non-African American coworkers who may have

15

jumped the line for a promotion does not satisfy this requirement.  Baker has not established the fourth prong of a *prima facie* case of discrimination under the *McDonnell Douglas* framework. Consequently, he cannot argue that his race was *the* motivation behind non-renewal of his employment contract.

As mentioned above, however, Baker also bases his discrimination claim on a mixed-motive theory of liability: his race was *one* factor motivating non-renewal even if it was not *the* motivating factor.  *Compare* 42 U.S.C. § 2000e-2(m) (prohibiting using race as a "motivating factor" behind an adverse action, "even though other factors also motivated" the action) *with* 42 U.S.C. § 2000e-2(a)(1) (prohibiting adverse actions undertaken "because of" race).  Ferris State does not argue that Count I is subject to summary judgment under a mixed-motive theory.  Count I therefore survives, though Baker may only prosecute a mixed-motive claim as provided under 42 U.S.C. § 2000e-2(m); he cannot recover under 42 U.S.C. § 2000e-2(a)(1).

### B. Count II

Count II asserts retaliation.  Title VII prohibits employers from taking adverse actions against an employee "because he has opposed any practice made [] unlawful" by Title VII, "or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing" as defined in Title VII.  42 U.S.C. § 2000e-3(a).  Baker claims he was subjected to retaliation by Ferris State when he was placed on the PIP and when his employment contract was not renewed.  The parties have cross-moved for summary judgment on Count II. Because the Court finds that genuine issues require resolution at trial, the Court will address the motions for summary judgment in tandem.

"The opposition clause protects not only the filing of formal discrimination charges with the EEOC, but also complaints to management and less formal protests of discriminatory employment practices."  *Laster v. City of Kalamazoo*, 746 F.3d 714, 730 (6th Cir. 2014) (citing

16

*Trujillo v. Henniges Auto. Sealing Sys. N. Am., Inc.*, 495 F. App'x 651, 655 (6th Cir. 2012) ("We have repeatedly held that complaints to human resources personnel regarding potential violations of Title VII constitute protected activity for the purposes of establishing a prima facie case of retaliation.")).

As with Count I, Baker bases his retaliation claim on circumstantial evidence.[5]   The *McDonnell Douglas* framework applies here, too.   *Laster*, 746 F.3d at 730.   Baker must first establish a *prima facie* case of retaliation, Ferris State must then articulate a legitimate, nondiscriminatory reason for its actions, and Baker must respond with evidence demonstrating that the reasons given by Ferris State are merely pretextual.

### 1. The PIP

The parties have made a mess here.   In its own motion for summary judgment, Ferris State limits its retaliation analysis to the non-renewal of Baker's employment contract.   (Def.'s Br. in Supp. of Mot. for Summ. J. 44-47.)   In his motion for summary judgment, Baker argues that Ferris State retaliated against him "first by putting him on a [PIP] and then by refusing to renew his teaching contract."   (Pl.'s Br. in Supp. of Mot. for Summ. J. 1.)   But he offers an incomplete analysis of the PIP issue and instead rolls the PIP into his argument that his non-renewal was retaliation.

Responding to Baker's motion, Ferris State requests summary judgment "as the nonmoving party pursuant to Fed. R. Civ. P. 56(f)(1), or, alternatively," to grant its own motion for summary judgment.   Rule 56(f)(1) permits the Court to *sua sponte* enter summary judgment in favor of the

---

[5] Once in his opening brief and several times in his reply brief, Baker calls Okonoski's October 3 email highlighting Baker's complaint of racial discrimination as direct evidence of retaliation.   That is probably true.   But for whatever reason, Baker claims he is entitled to summary judgment by applying the *McDonnell Douglas* framework, which only governs claims based on circumstantial evidence.   The Court will follow Baker's lead and analyze whether his claim of retaliation based on the PIP survives the *McDonnell Douglas* framework.

nonmoving party so long as there is no genuine dispute of material fact.  *In re Sams*, 106 B.R. 485, 491 (S.D. Ohio 1989).

The Court will not enter summary judgment for anyone on this claim because: (1) Ferris State fails to request it in its own motion for summary judgment; (2) Baker fails to justify it in his cross-motion for summary judgment; and (3) for the reasons explained below, the Court finds there are genuine disputes of material fact precluding summary judgment on the PIP issue.

### (a) Baker establishes a *prima facie* case

Four elements establish a *prima facie* case in the retaliation context.  Baker must show that: "(1) he engaged in activity protected by Title VII; (2) his exercise of such protected activity was known by the defendant; (3) thereafter, the defendant took an action that was 'materially adverse' to [Baker]; and (4) a causal connection existed between the protected activity and the materially adverse action."  *Laster*, 746 F.3d at 730 (citations and internal quotation marks omitted).

With respect to the PIP, Baker shows that he engaged in protected activity by complaining about perceived racial discrimination in his employment.  In the October 3 email that precipitated the PIP, Okonoski stated that Baker "has on several occasions suggested, subtly and not, that he is being discriminated against—be it by me, or others" and that Baker "insinuated" racial discrimination was behind the denial of a travel grant and Baker's difficulties in getting online courses approved.  (10/3/2018 Okonoski Email.)  Ferris State criticizes the purported complaints as too vague.  "Title VII does not protect an employee . . . if his opposition is merely a 'vague charge of discrimination.'"  *Yazdian v. ConMed Endoscopic Techs., Inc.*, 793 F.3d 634, 645 (6th Cir. 2015) (quoting *Booker v. Brown & Williamson Tobacco Co.*, 879 F.2d 1304, 1313 (6th Cir. 1989)).

But vagueness in this context refers to whether the employer *understood* that the employee was opposing purported discrimination based on a protected class.  Ferris State's reliance on

18

*Scheske v. University of Michigan Health System*, 59 F. Supp. 3d 820 (E.D. Mich. 2014) is misplaced.  There, the court ruled a female employee was unable to claim retaliation based on her sex because her complaints were so vague on the issue of discrimination that the defendant was not "on notice that [the plaintiff] was opposing a discriminatory practice."  *Id.* at 828.  In her complaint to her supervisor, the plaintiff "never mention[ed] the term 'discrimination' and . . . [did] not state that the [defendant] treat[ed] women in a discriminatory manner.  Gender [was] never explicitly mentioned[.]"  *Id.*  Here, by contrast, Okonoski clearly understood that Baker was complaining about racial discrimination.  In fact, Okonoski was aware of specific examples where Baker felt he was mistreated because of his race.  If some of Baker's complaints were "subtl[e] or "insinuated," they were still direct enough.  The Sixth Circuit "'does not . . . require that the plaintiff's complaint be lodged with absolute formality, clarity, or precision,'" so long as the complaint provides adequate notice to the defendant.  *Yazdian*, 793 F.3d at 645 (quoting *Stevens v. Saint Elizabeth Med. Ctr., Inc.*, 533 F. App'x 624, 631 (6th Cir. 2013)).

Ferris State next argues that Baker "did not have an objectively reasonable basis to believe that he had been discriminated against with respect to the matters he raised with Piette" in early 2018.  (Def.'s Resp. in Opp'n to Pl.'s Mot. for Summ. J. 28.)  "Given the frivolous nature of the complaints that [Baker] raised with Piette," Ferris State concludes "there is no reason to suppose that [Baker] said something more substantive to Okonoski."  (*Id.*)  This conjecture is directly contradicted by the fact that Okonoski pointed to two substantive issues: denial of a travel grant and difficulty getting online courses approved that would increase Baker's compensation.  Even assuming that refusal to approve income-boosting courses for discriminatory reasons would not constitute an adverse action, it is close enough: "A person opposing an apparently discriminatory practice does not bear the entire risk that it is in fact unlawful; he or she must only have a good

19

faith belief that the practice is unlawful." *Booker*, 879 F.2d at 1312-13.  The complaints of discrimination referenced in the October 3 email constituted protected activity.

From the above, it is also clear that Okonoski knew about the protected activity that led to the PIP.  Okonoski highlighted Baker's complaints about racial discrimination in his October 3 email seeking advice from Jackson and others on how to address issues with Baker.  Jackson recommended that Okonoski issue a PIP on Baker, which Okonoski did.  Thus, Okonoski knew about Baker's protected activity at the time he issued the PIP.  The second element is satisfied. The third element is also satisfied because the issuance of a PIP constituted a materially adverse action.

Ferris State contends that Baker cannot show a causal connection between Baker's complaints and the PIP because multiple people, including Jackson (himself African American), saw the October 3 email and supported Okonoski's decision to issue a PIP on Baker.   For one, Ferris State claims that "[i]t was Dean Jackson who actually made the decision to place [Baker] on the PIP." (Def.'s Resp. in Opp'n to Pl.'s Mot. for Summ. J. 29.)  This contention is unsupported by the portion of Jackson's deposition cited by Ferris State and comes dangerously close to a plain misrepresentation.  In the two cited pages, Jackson says he gave Okonoski a template for a PIP and provided feedback on Okonoski's draft (Jackson Dep. 40-41), but earlier Jackson clearly stated that he simply suggested a PIP to Okonoski (*id.* at 39).

Either way, Ferris State further argues that Okonoski cannot have meant his email and PIP to be retaliatory because Jackson, who is African American, would never condone issuing a PIP against Baker for complaining about racial discrimination.  That is for the jury to decide; no rule of law states that a member of a protected class would not participate in retaliation against a member of his own protected class for complaining about discrimination.  Ferris State has its own

plausible account of events.  But the fact remains that Okonoski sent an email problematizing, among other things, Baker's complaints of racial discrimination, and that email led to the PIP. Baker has shown a causal connection between the protected conduct and materially adverse action. He has therefore satisfied the fourth element and demonstrated a *prima facie* case of retaliation.

### (b) Ferris State articulates a legitimate, nondiscriminatory reason

Because Baker has established a *prima facie* case of retaliation through the PIP, the burden now shifts to Ferris State to articulate a legitimate, nondiscriminatory reason for the PIP.  It has easily done so.  As mentioned, the October 3 email is the foundation of Baker's retaliation claim with respect to the PIP.  That same email listed various other issues with Baker's performance: Baker refused to admit mistakes, did not respect Okonoski's authority, did not reliably respond to emails on important matters, and frequently attempted to circumvent the school's administrative structures to get what he wanted.  Baker does not seriously contest that Ferris State has failed to articulate legitimate, nondiscriminatory reasons for issuing the PIP.  Ferris State has met its burden.

### (c) Baker presents evidence indicating pretext

Baker offers no argument for why the reasons articulated by Ferris State are merely pretext for a retaliatory PIP.  (*See* Pl.'s Br. in Supp. of Mot. for Summ. J. 18-21 (limiting pretext analysis to failure to renew contract).)  Nevertheless, the Court will not enter summary judgment through Rule 56(f)(1) because the October 3 email itself shows a genuine issue requiring resolution by a jury.  The email offers four broad reasons—three permissible, one potentially impermissible—for taking corrective action that ultimately came through the PIP.  The jury may look at the email and simply see inartful wording, given how the email's recipients, including an African American dean, all appeared to be on board with a PIP.  Or a jury could find otherwise.  A reasonable jury could render a favorable verdict to either party on the PIP issue.  The Court will therefore deny Baker's motion for summary judgment and decline Ferris State's invitation to use Rule 56(f)(1).

### 2. Non-renewal of employment contract

Baker also claims that the non-renewal of his contract, precipitated by Okonoski and Schavey's recommendation, was retaliation for triggering an EO investigation.  Again, the Court finds that Baker has established a *prima facie* case of retaliation, that Ferris State has articulated legitimate, nondiscriminatory reasons for its action, and that Baker has presented evidence that, if believed, would demonstrate the proffered reasons were merely pretextual.

### (a) Baker establishes a *prima facie* case

As with the PIP, Baker must show that he: (1) engaged in protected activity; (2) that Okonoski and Schavey knew he engaged in protected activity; (3) that he was subjected to a materially adverse action; and (4) that there was a causal connection between the protected activity and the materially adverse action.

Baker engaged in protected activity by initiating an EO investigation into racial discrimination.  Ferris State says he did not engage in protected activity because "no reasonable person could have believed that that the underlying incident complained about constituted unlawful discrimination[.]"  (Def.'s Br. in Opp'n to Pl.'s Mot for Summ. J. 30 (quoting *Theriault v. Dollar Gen.*, 336 F. App'x 172, 174 (6th Cir. 2009) (internal quotation marks omitted)).)  But at least a few issues initially raised by Baker could potentially be the result of unlawful discrimination, including his contention that he was frequently passed over for tenure due to his race.  (*See* 2/28/2018 Baker Email, ECF No. 110-7, PageID.905-906.)  Remembering that "[a] person opposing an apparently discriminatory practice does not bear the entire risk that it is in fact unlawful" so long as he believes in good faith that the practice is unlawful,  *Booker*, 879 F.2d at 1312-13, the Court finds that Baker engaged in protected activity.

Ferris State does not argue that Okonoski and Schavey did not know Baker engaged in protected conduct, or that the recommendation and ultimate non-renewal of Baker's contract was

not an adverse action.  The Court will therefore assume that Baker has satisfied the second and third elements of his *prima facie* case.

Last is causation.  Baker points to the close temporal proximity of the protected activity and the adverse action: Okonoski and Schavey learned about Baker's EO investigation on April 3, 2019, and emailed Reifert and Jackson on April 9 to recommend that Baker's contract not be renewed.  Ferris State counters that temporal proximity alone cannot establish causation and that Baker's long history of purportedly unsatisfactory performance offers the better explanation.

First, close temporal proximity can be sufficient to satisfy the fourth element of the *prima facie* case.  "'Where an adverse employment action occurs *very close* in time after an employer learns of a protected activity.'" *Lindsay v. Yates*, 578 F.3d 407, 418 (6th Cir. 2009) (quoting *Mickey v. Zeidler Tool & Die Co.*, 516 F.3d 523, 525 (6th Cir. 2008)).  In *Lindsay*, the Sixth Circuit found a gap of eleven days between protected activity and an adverse action to be close enough in time to satisfy the causation prong of a *prima facie* case.  *Id.* at 419-20.  The Sixth Circuit reached the same conclusion in *Mickey*, where 12 days separated the protected activity from the adverse action. *Mickey*, 516 F.3d at 523.  The six-day gap between Okonoski and Schavey learning of Baker's EO complaint and recommending his non-renewal is sufficient to satisfy the causation prong.

Temporal proximity cannot, by itself, demonstrate *pretext*, but that issue is reserved for the third stage of *McDonnell Douglas*.  *Asmo v. Keane, Inc.*, 471 F.3d 588, 598 (6th Cir. 2006) ("[T]emporal proximity . . . cannot alone prove pretext . . . [but] can be used an indirect evidence to support an employee's claim of pretext." (internal citations and quotation marks omitted)).  Also premature is Ferris State's argument that Baker lost his job because of deficient performance and failure to improve.  That analysis belongs in the second phase of *McDonnell Douglas*, where Ferris State must articulate a nondiscriminatory reason for not renewing Baker's employment contract.

23

Okonoski and Schavey had major issues with Baker since at least October 2018.  They say Baker was not making any meaningful progress on his PIP.  But they recommended not renewing Baker's contract just six days after they learned he was bringing an EO investigation.  That temporal proximity is sufficient to establish causation at the *prima facie* stage.  Thus, Baker has established a *prima facie* case of retaliation.

#### (b) Ferris State articulates legitimate, nondiscriminatory reasons

As with the PIP, Ferris State has articulated numerous legitimate, nondiscriminatory reasons for not renewing Baker's contract.  In addition to the reasons provided in the PIP context, Ferris State also points to Baker's purported lack of progress with respect to the PIP itself.  According to Ferris State, Baker was placed on the PIP to address various performance issues and Baker did not show significant improvement.  As a result, Ferris State declined to renew his performance contract.  Ferris State has met its burden.

#### (c) Neither party wins on pretext

Now Baker must produce "sufficient evidence from which a jury could reasonably reject [Ferris State's] explanation" of why it did not renew his employment contract. *Chen v. Dow Chem. Co.*, 580 F.3d 394, 400 (6th Cir. 2009).  He can do so by showing, in some combination, "(1) that the proffered reasons had no basis in fact, (2) that the proffered reasons did not actually motivate [Ferris State's] action, or (3) that they were insufficient to motivate [Ferris State's] action." *Id.* Baker argues that the proffered reasons did not motivate his non-renewal, nor would the reasons be sufficient to do so.

##### *Baker has not shown pretext is indisputable*

First, Baker points out that everyone, including Okonoski, thought he was a good teacher. Therefore, he says, administrative issues of lesser importance could not possibly justify non-renewal, especially considering that other professors and instructors also fell short when it came

to administrative matters. Ferris State rightly counters Baker simply disagrees with his supervisors' assessments. (Def.'s Br. in Opp'n to Pl.'s Mot. for Summ. J. 36 (citing *Blizzard v. Marion Tech. Coll.*, 698 F.3d 275, 286 (6th Cir. 2012)).) Indeed, in his October 3 email, Okonoski acknowledges Baker's good teaching but concludes that he is an overall "average employee" when accounting for Baker's performance of non-teaching duties. Moreover, from the record presented by Baker, it is not clear that his colleagues struggled with administrative issues to the extent that Baker did.

Baker also targets Piette's EO investigations, accusing her of collaborating with Okonoski and Schavey to ensure that his non-renewal would look legitimate rather than retaliatory. He says that his supervisors sent Piette "cherry-picked documents with the knowledge they were needed to combat [Baker's] assertions of race discrimination." (Pl.'s Br. in Supp. of Mot. for Summ. J. 20.) Drawing inferences in Ferris State's favor, as the Court must on Baker's motion for summary judgment, a jury could reasonably conclude that the "cherry-picked documents" simply and innocently explained why Okonoski and others wanted Baker gone. Piette asked why they wanted to not renew Baker's contract, and they responded by pointing to what they saw as Baker's shortcomings.

Baker has not shown that the proffered reasons for his non-renewal are indisputably pretextual. Consequently, his motion for summary judgment on Count II will be denied.

### *Ferris State has not foreclosed the possibility of pretext*

With respect to Ferris State's motion, the Court finds that a reasonable jury could conclude that its proffered reasons for Baker's non-renewal were merely pretextual. As Baker points out, there is close temporal proximity between Okonoski learning of the EO investigation and his recommendation to not renew Baker's contract. Temporal proximity alone is not enough to

demonstrate pretext, *Asmo*, 471 F.3d at 598, but Baker also cites Okonoski's October 3 email.  A reasonable jury could see that email and determine that Okonoski had *already* retaliated against Baker for complaining about discrimination.  The fact that Okonoski recommended terminating Baker six days after learning of more discrimination complaints could thus be another instance of retaliation.  Regarding Ferris State's motion for summary judgment, then, there is a genuine dispute of material fact on the question of pretext.

## IV. CONCLUSION

For the foregoing reasons, the Court will deny Baker's motion for summary judgment on Count II (ECF No. 114) and partially grant Ferris State's motion for summary judgment on all Counts (ECF No. 109).  Count I fails to the extent it is based on 42 U.S.C. § 2000e-2(a)(1) but survives to the extent it is based on a mixed-motive theory of liability, 42 U.S.C. § 2000e-2(m). Ferris State's motion will be denied in all other respects.  An order will enter consistent with this opinion.


Dated:   September 2, 2021                          /s/ Hala Y. Jarbou
                                                    HALA Y. JARBOU
                                                    UNITED STATES DISTRICT JUDGE

26